IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JARED LEE ALBRIGHT, | ) | Case No. 1:20-cv-1729 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Jared Lee Albright, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under title XVI of the Social Security Act.  Albright suffers from nail-patella syndrome; a congenital disorder affecting his bones and joints.  He challenges the ALJ's negative findings, contending the administrative law judge ("ALJ") misevaluated the effects of his nail-patella syndrome at Step Three of the sequential evaluation process and the opinion evidence concerning his manipulative limitations at Step Four.  He also argues that the ALJ improperly substituted her own lay opinions for the expert opinion evidence of his manipulative limitations. However, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Albright's application for SSI be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## I.    Procedural History

On September 19, 2016, Albright applied for SSI.  (Tr. 228-33).[2]  Albright alleged that he became disabled on June 1, 2016, due to: (1) partial blindness in the left eye; (2) nail-patella syndrome; (3) arthritis; (4) arm and wrist limitations, including limited movement and range of motion; (5) dislocating kneecaps and shoulders; (6) attention-deficit disorder; (7) post-traumatic stress disorder; (8) depression; and (9) anxiety.  (Tr. 228); *see* (Tr. 266).  The Social Security Administration denied Albright's application initially and upon reconsideration.  (Tr. 88-105, 107-22).  Albright requested an administrative hearing.  (Tr. 133-35).

ALJ Jeannine Lesperance heard Albright's case on August 20, 2019 and denied the claim in a September 20, 2019 decision.  (Tr. 20-87).  In doing so, the ALJ determined at Step Three of the sequential evaluation process that Albright did not have an impairment that met or equaled Listing 5.08 (weight loss due to a digestive disorder) because:

> [T]he objective medical evidence does not indicate that [Albright] has a medically determinable impairment of a digestive disorder, which is required under this listing.  Here, the medical evidence of record does not indicate a history of weight loss; instead, [Albright's] weight has remained relatively stable, though low, throughout the period at issue.

(Tr. 24).  At Step Four of the sequential evaluation, the ALJ determined that Albright had the residual functional capacity ("RFC") to perform light work, except that:

> [Albright] can stand and/or walk for a total of 4 hours in an 8 hour workday for 30 minutes at a time.  He can occasionally climb ramps and stairs, and occasionally stoop, kneel, crawl, and perform a shallow crouch, but should not perform deep squatting.  He should never climb ladders, ropes, or scaffolds, and should have no exposure to hazards, such as unprotected heights or work in proximity to exposed moving mechanical parts.  He can *frequently handle and finger with his bilateral upper extremities.*  He can perform tasks that do not require precise binocular vision, sharp peripheral vision on the left, or precise depth perception, such as is required to thread a needle.  He should not engage in occupational driving.  He can perform tasks of any complexity at an average pace without strict time or production demands and with no more than occasional changes in duties.

---

[2] The administrative transcript appears in ECF Doc. 12.

(Tr. 26 (emphasis added)).

Based on vocational expert testimony that an individual with his age, experience, and RFC could work in such representative occupations as an office helper, storage facility rental clerk, and parking lot attendant, the ALJ determined that Albright wasn't disabled because he could perform a significant number of jobs in the national economy. (Tr. 33-34). On June 9, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On August 5, 2020, Albright filed a complaint to obtain judicial review. ECF Doc. 1.

## II.   Evidence

### A.   Personal, Educational, and Vocational Evidence

Albright was born on March 20, 1987, and he was 29 years old on the alleged onset date. (Tr. 88, 228). He graduated from high school and completed three years of college. (Tr. 48, 267). Albright had past relevant work as a fast-food worker, gas station attendant, bench assembler, and car hop, which the ALJ determined he was unable to perform. (Tr. 33, 254, 268).

### B.   Relevant Medical Evidence

On May 31, 2018, Albright visited Neil Mangat, MD, "to discuss disability." (Tr. 404). Albright reported that he suffered from nail-patella syndrome – a congenital disease he was formally diagnosed with when he was 16 years old. *Id.* Albright reported pain in his wrists, elbows, and knees, subluxations of the hip, and pain with prolonged sitting and walking. *Id.* A review of systems was positive for arthralgias and gait problem. *Id.* Upon physical examination, Albright's elbows, wrists, and knees exhibited normal range of motion, but he also had "[s]ome weakness in the knees and significant weakness in the wrists." (Tr. 404-05). Dr. Mangat

diagnosed Albright with nail-patella syndrome, referred Albright to physical therapy and orthopedic treatment, and ordered x-rays of Albright's knees and hips.  (Tr. 405).

On July 7, 2018, Albright visited William Sesco, DC, for his neck and mid and lower back.  (Tr. 494).  Albright reported moderate cervical and thoraco-lumbar pain, rated at 5/10 and 6/10, respectively.  *Id.*  Dr. Sesco noted decreased range of motion in both areas.  *Id.*

On August 14, 2018, Albright returned to Dr. Mangat to discuss his hip and knee x-ray results, which were normal.  (Tr. 409-10).  A review of systems was positive for arthralgias.  (Tr. 409).  Upon physical examination, Albright's elbows exhibited a "deformity" and his knees exhibited atrophy of the patella.  *Id.*  Dr. Mangat reiterated Albright's nail-patella syndrome diagnosis and re-referred him to orthopedic treatment.  (Tr. 410).

On November 1, 2018, Albright visited Robert Magnussen, MD, for an evaluation of his knees.  (Tr. 482).  Albright reported moderate knee pain that was worsened by lying down for long periods of time.  *Id.*  Imaging tests conducted at the visit revealed no osteoarthritis but did show evidence of nail-patella syndrome.  (Tr. 484).  Dr. Magnussen diagnosed Albright with nail-patella syndrome and knee pain, noting that anterior knee pain was common for nail-patella syndrome.  *Id.*  Dr. Magnussen recommended physical therapy and NSAIDs.  *Id.*

On November 20, 2018, Albright returned to Dr. Sesco, again exhibiting moderate pain and decreased range of motion in the cervical and thoraco-lumbar spine, with pain rated at 6/10 and 4/10, respectively.  (Tr. 492).  On December 4, 2018, Albright reported 6/10 pain in both areas of the spine, and Dr. Sesco noted decreased range of motion.  (Tr. 488).

On December 5, 2018, Albright presented to Dr. Mangat to discuss his nail-patella syndrome, stating that he would like a handicap placard.  (Tr. 414).  Albright reported that he could walk "reasonably" on "good days" but on a bad day could walk only 20-30 feet before

4

needing to rest due to pain in his hip and knees. *Id.* A review of symptoms was positive for arthralgias, gait problem, and joint swelling. *Id.* Upon physical examination, Albright exhibited "4/5 baseline" in his upper extremity, 3/5 left hip flexion, 5/5 right hip flexion, 3/5 right knee extension, and 5/5 left knee extension, and normal knee flexion. (Tr. 415). Dr. Mangat provided the placard, stated that Albright needed a functional capacity evaluation for his nail-patella syndrome, and referred him to physical therapy. *Id.*

On January 22, 2019, Albright returned to Dr. Mangat for a follow up on his physical therapy and to discuss pain management. (Tr. 419). Dr. Mangat noted that Albright was using a cane due to winter weather. *Id.* A review of symptoms was positive for arthralgias, gait problem, and joint swelling in his fingers. (Tr. 420). Upon physical examination, his hands exhibited joint swelling and his knees exhibited deformity. *Id.* Dr. Mangat referred Albright to pain management and prescribed NSAIDs and Relafen. *Id.*

That same day, Albright visited Dr. Sesco, reporting moderate cervical and thoraco-lumbar pain, rated at 5/10 and 4/10, respectively. (Tr. 490). Dr. Sesco noted decreased range of motion as well. *Id.*

On February 12, 2019, Albright visited Dr. Mangat to review his physical therapy notes. (Tr. 425). His review of symptoms was the same as his January 22, 2019 visit. *Id.* Dr. Mangat ordered hip and kneecap subluxations for Albright's nail-patella syndrome and indicated that the description of Albright's range of motion and symptom complaints in his disability paperwork was based on orthopedic and physical therapy notes. (Tr. 426).

On March 29, 2019, Albright returned to Dr. Sesco, reporting moderate (6/10) cervical pain and severe (8/10) thoraco-lumbar pain. (Tr. 489). Dr. Sesco again noted decreased range of motion. *Id.*

5

On June 27, 2019, Albright presented to Dr. Mangat to discuss his nicotine dependence. (Tr. 441).  Dr. Mangat separately referred Albright to pain management and continued Relafen. (Tr. 442).

On July 18, 2019, Albright visited Wieging Physical Medicine, LLC for a physical therapy assessment.  (Tr. 453-54).  Albright reported hip pain, chest wall pain, "C/T p/tension, MBP, and LBP."  (Tr. 454).  Upon examination, his upper extremities exhibited normal range of motion, including his finger adduction and abduction.  (Tr. 449).  But he had reduced range of motion upon wrist extension.  *Id.*  A physical examination on July 25, 2019 showed full elbow flexion and wrist flexion and extension, but Albright had reduced elbow extension and scored 4/5 on manual muscle testing of the wrists.  (Tr. 455).  Thomas Schindler, PD, DPT, recommended physical therapy to address Albright's symptoms.  (Tr. 454).  Albright's diagnoses in relation to his physical therapy were cervical disc degeneration, thoracic pain, and lumbar pain.  (Tr. 450, 461).

On August 6, 2019, Albright visited Christina McGhee, APRN-CNP, for a pain management consultation regarding his joint pain.  (Tr. 496).  Albright reported chronic pain in his joints secondary to nail-patella syndrome, specifically: his neck, mid and low back, hips, hands, elbows, wrists, and knees.  *Id.*  In addition to physical therapy and chiropractic care, Albright treated his condition with ibuprofen, cannabis, and muscle relaxers.  *Id.*  He reported his pain as 4 (mild).  *Id.*  A review of symptoms was negative for weakness.  (Tr. 498).  Upon physical examination, Albright exhibited normal gait and restricted right elbow extension.  *Id.* Imaging tests revealed no osseous abnormality in Albright's knees.  (Tr. 499).  Nurse Practitioner McGhee diagnosed Albright with other chronic pain and nail-patella syndrome.  *Id.*

On August 12, 2019, Albright visited Dr. Mangat to obtain a letter stating his disability with nail-patella syndrome.  (Tr. 476).  A review of symptoms was positive for arthralgias and gait problem.  *Id.*  Dr. Mangat wrote a letter "regarding his significant debility in his joints limiting work ability" and prescribed Flexeril for his joint pain.  (Tr. 477).

During the relevant period, Albright measured between 5'8" and 5'9" and his weight fluctuated as follows:[3]

| 6/2/16 | 7/7/16 | 8/31/16 | 9/20/16 | 12/6/16 | 1/5/17 | 1/14/17 | 3/13/17 | 4/13/17 |
|---|---|---|---|---|---|---|---|---|
| 112.3 lb | 112.2 lb | 110.2 lb | 112.2 lb | 111.41 lb | 116.01 lb | 116 lb | 112.8 lb | 111.3 lb |
| BMI: 17.4 | BMI: 17.6 | | BMI: 17.6 | BMI: 17.4 | BMI: 18.2 | | BMI: 17.7 | BMI: 17.4 |
| 6/14/17 | 6/21/17 | 8/7/17 | 8/16/17 | 9/20/17 | 11/15/17 | 5/30/18 | 8/14/18 | 11/1/18 |
| 113.2 lb | 111 lb | 113.8 lb | 113 lb | 111.2 lb | 113.4 lb | 111 lb | 110 lb | 112 lb |
| BMI: 17.7 | BMI: 17.4 | BMI: 17.3 | BMI: 16.7 | BMI: 16.4 | BMI: 16.7 | BMI: 16.39 | BMI: 16.33 | BMI. 16.54 |
| 12/5/18 | 1/22/19 | 2/12/19 | 6/27/19 | 7/18/19 | 8/6/19 | 8/12/19 | | |
| 115 lb | 115 lb | 120 lb | 113 lb | 117 lb | 115 lb | 112 lb | | |
| BMI: 16.98 | BMI: 17.07 | BMI: 18.25 | BMI: 17.18 | | | BMI: 17.03 | | |

(Tr. 341, 343, 345, 356, 376, 378, 380, 382, 384-85, 387-90, 392, 400, 409, 415, 420, 426, 442, 449, 477, 483-84, 498).

---

[3] The BMIs for August 31, 2016, January 14, 2017, July 18, 2019, and August 6, 2019 are not included in the record.

### C.       Relevant Opinion Evidence

#### 1.       Treating Source – William Sesco, DC

On October 25, 2016, Dr. Sesco completed a medical questionnaire in connection with Albright's disability application, stating he had seen Albright from March 1, 2016 through September 15, 2016.  (Tr. 349).  Dr. Sesco stated that Albright had nail-patella syndrome.  (Tr. 348).  When asked to describe motor loss, spasms, atrophy, or radiculopathy symptoms, Dr. Sesco responded: "T.T.F. trapezius, rhomboids, paraspinal muscle quadratus lumborum." *Id.* Dr. Sesco pined that Albright had "hyper mobility" of the joints and Albright's ability to do fine and gross manipulation was within normal limits.  *Id.*

On December 28, 2018, Dr. Sesco completed a form physical RFC assessment.  (Tr. 428-31).  Dr. Sesco checked "Yes" on a box stating that Albright had significant manipulative limitations and, in describing the limitations, stated that Albright's "wrist goes out [*sic.*] does not turn [*sic.*] don't have full extension of arms."  (Tr. 429).  Dr. Sesco left blank the explanation portion of the RFC questionnaire and offered only a diagnosis of nail-patella syndrome to support his findings.  (Tr. 428, 431).

#### 2.       Treating Source – Neil Mangat, MD

On February 12, 2019, Dr. Mangat completed a form physical RFC assessment.  (Tr. 432-35).  Dr. Mangat checked "No" when asked whether Albright had "significant limitations with reaching, handling or fingering."  (Tr. 433).  Dr. Mangat cited Albright's nail-patella syndrome and chronic joint pain in support of his opinion.  (Tr. 432).  And in the explanation portion of the form, Dr. Mangat stated: "Born with this.  Formally diagnosed at 16 in Florida. Patient has [a history of motor vehicle accidents] complicating his symptoms further.  [P]ain in

wrists, elbows and knees, recurrent dislocations of the hip.  [D]ecrease elbow extension [illegible].  Generalized strength 4/5 globally."  (Tr. 435).

### 3.    Consultative Examiner – Justin Zamoyski, DO

On January 14, 2017, Justin Zamoyski, DO, examined Albright in connection with his disability application due to nail-patella syndrome.  (Tr. 355-63).  Albright's associated symptoms included having no thumb nails, decreased wrist range of motion, and mildly dislocated shoulders and hips.  (Tr. 355).  Albright reported his pain to be "3-6/10 on most days and 3/10 on examination."  *Id.*  His pain affected his ability to sit for prolonged periods of time, fully extend his arms, and focus.  *Id.*  Upon physical examination, Albright had normal sensory examination and 5/5 muscle tests throughout, including shoulder abductors and rotators, elbow and wrist flexors and extensors, and finger abductors and adductors.  (Tr. 360).  Albright also had normal grasp, manipulation, pinch, and fine coordination.  *Id.*  His range of motion was likewise normal throughout, including in his shoulders, elbows, wrists, and fingers.  (Tr. 361-62).  However, Albright also had tenderness throughout and osteoarthritis in his hands, abnormalities in his elbows and shoulders, and pain to palpation of the menisci.  (Tr. 358).

Dr. Zamoyski's impression was that Albright's range of motion was surprisingly intact given his joint abnormalities.  (Tr. 358-59).  Dr. Zamoyski confirmed Albright's nail-patella syndrome diagnosis and added multi-joint arthritis, noting that his condition appeared relatively "stable."  (Tr. 359).  Dr. Zamoyski opined that Albright could occasionally handle, feel, grasp, and finger due to his hand arthritis but had no manipulative limitations on reaching.  *Id.*

### 4.    State Agency Consultants

On January 27, 2017, state agency consultant Michael Hallet, MD, evaluated Albright's physical capacity based on a review of the medical record and determined that Albright had the

physical RFC to perform medium work.  (Tr. 98-101, 104).  As relevant here, Dr. Hallet

determined that Albright could reach, handle, and feel without limitation but was limited to

occasional fingering.  (Tr. 99).  On April 19, 2017, Michael Delphia, MD, concurred with Dr.

Hallet's assessment.  (Tr. 114-17, 120).

       **D.**      **Relevant Testimonial Evidence**

In his opening remarks at the August 20, 2019 ALJ hearing, Albright's representative

stated that for the majority of the record, Albright's BMI was under 17.5, which would equal

Listing 5.08.  (Tr. 45).  The ALJ stated that there were no gastrointestinal problems noted in the

record, and Listing 5.08 wouldn't apply absent a gastrointestinal cause.  (Tr. 46).  The ALJ stated

that he could not equal the listing because "there has to be at least a medically determinable

impairment that it relates to, and in this case … I didn't see one at all."  *Id.*  Albright's

representative asserted: "[O]ne of the symptoms of the disease is that it can cause GI problems."

*Id.*

Albright then testified that he was unable to work because of his joint problems.  (Tr. 57).

If he carried anything over five pounds, his wrists would start to come out.  *Id.*  And his wrists

dislocated twice per week on average.  (Tr. 66).  He believed his joint problems were partly

related to a car accident and partly related to his nail-patella syndrome.  (Tr. 57).  Albright

referred to his nail patella syndrome as a "born disability."  (Tr. 57).  It impeded his ability to

fully extend his arms and fully turn his wrists.  (Tr. 57-58).  When dislocated, he had 9/10 pain

and he had difficulty picking up things and could not type or write.  (Tr. 67-68).  He treated his

pain with stretches and physical therapy, as well as ibuprofen and muscle relaxer.  (Tr. 60).  He

also wore braces, but it would take up to three days for the wrists to pop back into place.  (Tr.

67).

Albright testified that his arthritis was related to his nail-patella syndrome.  (Tr. 75-76).
Albright also testified that he couldn't gain or lose weight, despite have a normal appetite.  (Tr.
59).  He had some constipation, but he did not know if that was related.  *Id.*

Relevant to the claims in this case, a vocational expert testified that an individual who
could only occasionally handle and finger could not perform any work, even at the sedentary
level.  (Tr. 82).

### III.  Law & Analysis

#### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was
supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.
§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial
evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154
(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of
the evidence supports the claimant's position, the Commissioner's decision still cannot be
overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."
*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks
omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-
weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is
not necessary that this court agree with the Commissioner's findings," so long as it meets this
low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the
Commissioner enjoys a "zone of choice" within which to decide cases without being second-
guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Step Three: Listing 5.08

Albright argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in her evaluation of whether Listing 5.08 was met or medically equaled.  ECF Doc. 13 at 3-8.  He argues that the ALJ failed to apply proper legal standards when she conducted an equivalency analysis in the absence of expert opinion evidence on whether Albright's nail-patella syndrome symptoms could medically equal Listing 5.08, especially given his chronically low weight.  ECF Doc. 13 at 4-8.

The Commissioner responds that the ALJ properly determined Listing 5.08 was not met because there was no medically determinable impairment of a digestive disorder or a history of weight loss.  ECF Doc. 14 at 5.  The Commissioner argues that Listing 5.08 requires a digestive disorder related to weight loss and there was no evidence in the record showing that Albright's low BMI was related to his nail-patella syndrome.  ECF Doc. 14 at 5-6

Albright replies that the issue of whether nail-patella syndrome could be considered a digestive disorder under Listing 5.08 is an issue reserved for a medical professional.  ECF Doc. 15 at 1-2.

### 1.    Step Three Standard

At Step Three, the claimant has the burden to prove that he has an impairment or combination of impairments that meet or medically equal a listed impairment.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 416.920(a)(4)(iii).  The claimant is conclusively presumed disabled if he meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step.  20 C.F.R. § 416.920(d)–(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Listing 5.08 governs weight loss due to a digestive disorder.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 5.00G.  Listing 5.08 requires "[w]eight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period."  *Id.* § 5.08.  Examples of digestive disorders applicable to Listing 5.08 include esophageal stricture, gastrointestinal hemorrhage, liver dysfunction, inflammatory bowel disease, pancreatic insufficiency, malabsorption, malnutrition, and short bowel syndrome.  *Id.* § 5.00A, G(1)

### 2.    Analysis

The ALJ applied proper legal standards in her evaluation of whether Listing 5.08 was medically equaled.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  For equivalency, the ALJ had to determine whether Albright had suffered weight loss due to the equivalent of "any digestive disorder despite continuing treatment as prescribed" and that the Albright's BMI was the equivalent of "less than 17.50 calculated on at least two evaluations at least 60 days apart within

a consecutive 6-month period."  20 C.F.R. § 416.926(a); 20 C.F.R. pt. 404, Subpt. P., App. 1 § 5.08; *see also Carlson v. Astrue*, 604 F.3d 589, 594 (8th Cir. 2010).  That assessment required the ALJ to first receive expert opinion evidence on the issue of equivalency.  SSR 96-6p, 1996 SSR LEXIS 3, *8 ("[L]ongstanding policy requires that the judgment of a physician … on the issue of equivalence on the evidence before the [ALJ] … must be received into the record as expert opinion evidence and given appropriate weight.");[4] *see also Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 U.S. App. LEXIS 35546, at *4 (6th Cir. Nov. 22, 1995) (unreported).  That obligation is satisfied when – as here – the state agency physicians signed the Disability Determination and Transmittal Form, which "ensures that consideration by a physician … has been given to the question of medical equivalence."  SSR 96-6p, 1996 SSR LEXIS 3, at *9; (Tr. 106, 123); *see also Bridges v. Comm'r of Soc. Sec.*, No. 1:09 CV 2872, 2011 U.S. Dist. LEXIS 31155, at *18 (N.D. Ohio Jan. 12, 2011) ("These forms implicitly provide the necessary requisite opinion negating medical equivalence.").

That being said, the ALJ was required to obtain updated medical opinion evidence if she determined that the record could support a finding of equivalence or the state agency consultant might have found equivalency in light of later-received evidence.  SSR 96-6p, 1996 SSR LEXIS 3, at *9-10; *see also Kelley ex rel. Hollowell v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 830 (6th Cir. 2009).

The central question Albright's claim raises is whether there was evidence suggesting that Albright's nail-patella syndrome medically equaled Listing 5.08.  The record shows at least two treatment notes at least 60 days apart within a 6-month period reflecting BMIs of less than

---

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p.  SSR 17-2p, 2017 SSR LEXIS 2, at *1.  But SSR 17-2p only applies to claims filed on or after March 27, 2017.  *Id.* at *12.  Because Albright's SSI application was filed before March 27, 2017, SSR 96-6p applies.  (Tr. 228).

17.5.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 5.08; *compare* (Tr. 387 (BMI of 17.4 on April 13, 2017)), *with* (Tr. 384 (BMI of 17.4 on June 21, 2017)).  But the ALJ found that there was no evidence that Albright suffered weight loss due to a digestive disorder despite continuing treatment as prescribed.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 5.08.  This finding was supported by substantial evidence because the record does not reflect that Albright ever received treatment for a digestive disorder; he apparently never expressed concern to any medical provider about his low weight; and no treatment provider expressed or even posited that Albright's low weight was due to his nail-patella syndrome.  *See* (Tr. 341-45, 375-93, 399-400, 404-05, 409-10, 414-15, 419-20, 425-26, 441-42, 469, 476-77, 482-96, 498-99).  Because there was no evidence "suggesting" that Albright's nail-patella syndrome combined with his low weight medically equaled Listing 5.08, the ALJ wasn't required to obtain additional expert opinion evidence on the issue of equivalency.  *Norris v. Colvin*, No. 1:13-CV-1737, 2014 U.S. Dist. LEXIS 111083, at *37 (N.D. Ohio July 15, 2014).

The Commissioner's argument seems to engraft requirements into Listing 5.08 that the regulations do not require.  For example, the Commissioner contends that for a digestive disorder to equal or be equivalent to Listing 5.08, the digestive disorder must be classified as "severe."  But the regulation does not say that.  In fact, it merely requires "any digestive disorder."  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 5.00G, 5.08.  Also, the Commissioner contends that in order for a claimant to meet or medically equal Listing 5.08, there must be weight loss within a defined period.  While that argument finds some support in the opening clause of Listing 5.08, it nevertheless engrafts a requirement on the regulation.  Albright could have met weight-requirement of the Listing in this case because his BMI was less than 17.5 calculated on at least two evaluations at least 60 days apart.  Despite the Commissioner's somewhat careless reference

to the regulation, however, I find that the ALJ correctly cited and analyzed Listing 5.08, and the absence of evidence supporting Albright's claim that he met it.

Albright's Listing 5.08 argument lacks merit and provides no basis for remand.

### C.    Step Four: Weighing Opinion Evidence

Albright argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in her evaluation of Dr. Sesco's and Dr. Zamoyski's opinions regarding his manipulative limitations. ECF Doc. 13 at 10-13. Albright argues the ALJ misevaluated Dr. Sesco's December 28, 2018 opinion by not identifying the consistency of Dr. Sesco's manipulative limitation findings with the other opinions supporting significant manipulative limitations. ECF Doc. 13 at 12. He argues the ALJ erred in discounting Dr. Sesco's December 28, 2018 opinion on the basis that he was not an appropriate medical source and his alleged limited expertise, given that arthritis and musculoskeletal impairments (the hallmarks of nail-patella syndrome) fell within the purview of chiropractic care. ECF Doc. 13 at 12-13. And, Albright argues, Dr. Sesco's opinion warranted "significant weight" due to the length of his treating relationship. ECF Doc. 13 at 13. Albright also argues that the ALJ misevaluated Dr. Zamoyski's opinion regarding his manipulative limitations based on normal muscle and range of motion tests because the ALJ ignored Dr. Zamoyski's supporting observations that Albright had tenderness of the fingers, elbow abnormalities, and difficulty moving his arms and legs. ECF Doc. 13 at 10. And, Albright argues, Dr. Zamoyski's opinion was supported by Dr. Mangat's treatment notes. ECF Doc. 13 at 11.

The Commissioner responds that the ALJ properly evaluated the opinion evidence, largely reiterating the ALJ's reasoning. ECF Doc. 14 at 9-12.

### 1.    Opinion Standard

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 416.927(c).  An ALJ must give a treating source opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  If an ALJ does not give a treating source's opinion controlling weight, she must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See id.* at 376; 20 C.F.R. § 416.927(c)(2)-(6).

### 2.    Dr. Sesco

Albright has not established that a remand is warranted based on the ALJ's evaluation of Dr. Sesco's December 28, 2018 opinion.  As a chiropractor, Dr. Sesco was not an "acceptable medical source" under the regulations; because of that, the ALJ was not required to assess whether to assign controlling weight to Dr. Sesco's opinions under 20 C.F.R. § 416.927(a)(1).  20 C.F.R. § 416.902(a); SSR 6-03p, 2006 SSR LEXIS 5, at *2-4.  The ALJ was only required to evaluate Dr. Sesco's opinion under the 20 C.F.R. § 416.927(c) factors and provide a sufficient explanation for us to follow her reasoning.  SSR 6-03p, 2006 SSR LEXIS 5, at *6-7, 15-16.

The ALJ complied with the regulations when she explained that she gave Dr. Sesco's December 28, 2018 opinion "little weight" because: (1) although a treating source, his expertise was limited to Albright's spine; (2) the record did not document any significant back impairments and Dr. Sesco did not attempt to explain or support the limitations expressed in his opinion; and (3) Dr. Sesco did not appear to be familiar with the Social Security Administration's program and requirements.  (Tr. 32); 20 C.F.R. § 416.927(c)(1), (3)-(5); *Tabor*

17

*v. Comm'r of Soc. Sec.*, No. 1:16-cv-2971, 2018 U.S. Dist. LEXIS 44552, at *11-12 (N.D. Ohio Mar. 18, 2018) ("The ALJ is not required to perform an exhaustive factor-by-factor analysis in order to fulfill her obligation to consider other source opinions pursuant to the SSR.").

Two of those reasons, however, are problematic.  Dr. Sesco's expertise was a relevant consideration; more weight is given to an opinion on a medical issue related to the source's specialty.  20 C.F.R. § 416.927(c)(5).  But the ALJ did not explain how expertise in chiropractic care limited Dr. Sesco to only offer opinions regarding Albright's spine and not his other skeletal and joint problems.  Nail-patella syndrome commonly causes skeletal abnormalities – reflected in the record as deformities in the knees and elbows.  Nail-Patella Syndrome, U.S. Nat'l Library of Med., MedlinePlus, https://medlineplus.gov/genetics/condition/nail-patella-syndrome/ (last visited September 15, 2021); (Tr. 409, 420).  And neuromusculoskeletal treatment falls within the ambit of chiropractic care.  Chiropractor Profession, A.D.A.M. Medical Encyclopedia (2021), available at Nat'l Inst. of Health, MedlinePlus, https://medlineplus.gov/ency/article/0020 01.htm (last visited September 15, 2021).

The lack of program knowledge also was a relevant consideration.  20 C.F.R. § 416.927(c)(6).  The ALJ inferred that Dr. Sesco lacked program knowledge because he failed to provide supporting explanations for the environmental limitations stated in his December 28, 2018 opinion.  (Tr. 32).  The evidentiary support for that conclusion is tenuous at best given the lack of any direct evidence on the issue of Dr. Sesco's program knowledge, or lack thereof.  *See Jones v. Comm'r of Soc. Sec.*, No. 1:19-cv-1076, 2020 U.S. Dist. LEXIS 30172, at *35 (N.D. Ohio Feb. 21, 2021).

Nevertheless, the ALJ's finding that the degree of limitations stated in Dr. Sesco's opinion lacked supportability could independently justify giving the opinion "little weight."

*Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).  Dr. Sesco's opinion

consisted merely of checked boxes on a form with only a bare diagnosis to support it.  (Tr. 428-

31).  On that basis alone, the ALJ was free to discount Dr. Sesco's opinion.  *Ellars v. Comm'r of*

*Soc. Sec.*, 647 F. App'x 563, 566-68 (6th Cir. 2016); *see also Hyson v. Comm'r of Soc. Sec.*, No.

5:12CV1831, 2013 U.S. Dist. LEXIS 79803, at *38 (N.D. Ohio June 5, 2013) ("Because Dr.

Martinez failed to provide an explanation of her conclusions or identify any objective medical

evidence to support her opinions, the ALJ did not err in discounting her opinion.").

Moreover, it's questionable whether Dr. Sesco's December 28, 2018 RFC questionnaire

responses even expressed an opinion on Albright's manipulative limitations.  Dr. Sesco checked

"Yes" to indicate there were "significant limitations with reaching, handling or finger."  (Tr.

429).  And he described the limitation as "wrist goes out [*sic.*] does not turn [*sic.*] don't have full

extension of arms."  *Id.*  But he did not state what manipulations Albright could perform despite

his impairments – a requirement for a medical opinion.  20 C.F.R. § 416.927(a)(1); *see also Soto*

*v. Comm'r of Soc. Sec.*, No. 17-10054, 2018 U.S. Dist. LEXIS 50606, at *12 (E.D. Mich. Mar. 2,

2018) ("[T]he ALJ need not assign any weight to evidence that is not a medical opinion.").

Albright has not established that a remand is warranted based on any alleged ALJ error in the

evaluation of Dr. Sesco's December 28, 2018 RFC questionnaire.  *Rabbers*, 582 F.3d at 654.

### 3.    Dr. Zamoyski

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in her evaluation of Dr. Zamoyski's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at

241.  Because Dr. Zamoyski was a consultative examiner who rendered his opinion based on a

single examination of Albright, the ALJ was not required to give his opinion controlling weight

or articulate "good reasons" for not doing so.  *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x

462, 467 (6th Cir. 2017).  The ALJ was only required to state the weight assigned to Dr.

Zamoyski's opinion and evaluate it under the 20 C.F.R. § 416.927(c) factors.  20 C.F.R.

§ 416.927(f); SSR 96-6p, 1996 SSR LEXIS 3, at *5.  And the ALJ did just that by explaining

that she assigned "little weight" to Dr. Zamoyski's opinion on Albright's manipulative

limitations because his findings were inconsistent with the objective evidence, including Dr.

Zamoyski's own findings, and there was no evidence to support more severe limitations in

Albright's ability to feel.  (Tr. 31).  Although limited to consistency, the ALJ was not required to

expressly discuss how each factor was considered.  *Biestek*, 880 F.3d at 786.

Substantial evidence supported the ALJ's conclusions, including: (1) Dr. Zamoyski's

findings that Albright had normal sensory examination, 5/5 muscle tests, normal grasp,

manipulation, pinch, and fine coordination, and normal range of motion (Tr. 358-59, 360-62);

(2) Dr. Mangat's treatment notes describing normal or slightly reduced (4/5) range of motion in

Albright's elbows and wrists (Tr. 404, 415); (3) Albright's physical therapy assessment, noting

normal range of motion in the upper extremity but reduced range of motion in wrists and elbows

and 4/5 muscle testing of the wrists (455); (4) Dr. Hallet's and Dr. Delphia's opinion that

Albright had no limitations in reaching, handling, and feeling (Tr. 99, 114-17); and

(5) Dr. Mangat's opinion that Albright had no significant manipulative limitations (Tr. 433).

Further, I disagree with Albright's contention that the ALJ ignored Dr. Zamoyski's

observations that Albright had tenderness in the fingers, elbow abnormalities, and difficulty

moving his arms or legs and Dr. Mangat's findings of wrist weakness and swelling.  ECF Doc.

13 at 10-11.  The ALJ expressly considered Dr. Mangat's findings in her evaluation of Albright's

subjective symptom complaints and of Dr. Mangat's opinion.  (Tr. 28-29, 31).  And the ALJ

expressly discussed the inconsistency between Dr. Zamoyski's opinion regarding Albright's

manipulative limitations and the objective examination findings attached to his opinion.  (Tr. 31, 358-59).  A common-sense reading of the ALJ's decision shows that the ALJ did not ignore evidence, but determined that the evidence she cited supported a conclusion that the longitudinal record weighed in favor of her ultimate RFC finding.  *Buckathorn ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."); *Solembrino v. Astrue*, No. 1:10-cv-01017, 2011 U.S. Dist. LEXIS 58237, at *25 (N.D. Ohio May 27, 2011) ("[A]n ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to the claimant's position.").

Because the ALJ adequately explained the weight she assigned to Dr. Zamoyski's opinion and because her reasons for the weight given were reasonably drawn from the record, the ALJ's decision to give his opinion "little weight" fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d at 877.

## D.     Step Four: Physical RFC

Albright next argues that the ALJ made improper medical determinations when she substituted her lay opinions for the medical expert opinion evidence regarding Albright's functional limitations in his upper extremities.  ECF Doc. 13 at 8-10, 13-15; ECF Doc. 15 at 2-6.

The Commissioner responds that the ALJ did not make independent medical findings but instead evaluated the evidence and resolved discrepancies in fashioning her RFC, which was supported by substantial evidence.  ECF Doc. 14 at 7-10.

The ALJ did not err by not pegging her RFC determination of Albright's manipulative limitations to any single medical opinion.  The Sixth Circuit has "rejected the argument that an [RFC] determination cannot be supported by substantial evidence unless a physician offers an

opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  The RFC determination "is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner."  *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017).  And an ALJ does not err by not grounding her RFC determination in an individual physician's opinion of what the claimant's functional limitations are.  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base [his] RFC finding on a physician's opinion would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." (quotation marks omitted)).  So long as the ALJ's evaluation of the opinion evidence complied with the regulations, the ALJ can make an RFC determination using medical opinions that were not credited as a "guide to peg [an RFC] finding."  *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 U.S. Dist. LEXIS 122296, at *5 (N.D. Ohio Oct. 21, 2011).

As discussed above, the ALJ properly evaluated both Dr. Sesco's and Dr. Zamoyski's opinion evidence concerning Albright's manipulative limitations, and he has not challenged the ALJ's evaluation of state agency consultants' opinions.  *United States v. Olano*, 507 U.S. 725, 733 (1993).  Thus, on this ground, I can find no error in how the ALJ formulated Albright's physical RFC.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Albright's application for SSI benefits be affirmed.

Dated: September 15, 2021

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).